UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
PADO, INC. and HOMELEC KOREA CO., LTD.,

                Plaintiffs,

    -against-

SG TRADEMARK HOLDING CO. LLC, WIEDER
AND FRIEDMAN ENTERPRISES INC., MOSHE
FRIEDMAN a/k/a/ COY WEST, HERSCHEL
FRIEDMAN, ABC CORPORATIONS 1-10,
and JOHN DOES 1-10,

                Defendants.
----------------------------------------------------------X
SG TRADEMARK HOLDING CO. LLC and
WIEDER AND FRIEDMAN ENTERPRISES INC.,

                Counterclaimants,

    -against-

PADO, INC., HOMELEC KOREA CO., LTD.,
STEVEN LEE, ABC CORPORATIONS 1-10,
and JOHN DOES 1-10,

             Counterclaim-Defendants.
----------------------------------------------------------X

**MEMORANDUM AND ORDER**
19-CV-6614 (RPK) (RER)

RACHEL P. KOVNER, United States District Judge:

      This opinion arises out of a bare-knuckled intellectual property dispute between two makers of handheld massage devices. The plaintiff-manufacturers of the "Purewave" massage device first filed suit alleging that the makers of the competing "Mighty Bliss" device were infringing their patent, copyright, and trademark rights. But then the lawsuit took a turn: the defendants apparently noticed that plaintiffs had never obtained federal registration of the trademark "Purewave." Indeed, the similar trademark "Purwave" (without the first "e") was

registered to a different company, Sigma Instruments, Inc.  After plaintiffs filed their suit, defendants bought the "Purwave" mark from Sigma Instruments.  Armed with that mark, defendants have filed counterclaims against plaintiffs, alleging that the Purewave devices infringe their recently acquired mark.  Plaintiffs, for their part, have amended their complaint to seek cancellation of the defendants' Purwave mark, a declaratory judgment that plaintiffs have not infringed the Purwave mark, and other relief.

Plaintiffs now seek summary judgment on the claims and counterclaims relating to defendants' Purwave mark.  They argue that defendants never actually acquired rights to the Purwave mark because Sigma Instruments had abandoned the mark before selling it to defendants.  *See* Pls.' Mem. of L. in Supp. of Partial Summ. J. at 6, 8-9 ("Pls.' Br.") (Dkt. #64-1).  Once abandoned, a federally registered trademark "returns to the public domain and may, in principle, be appropriated for use by other actors in the marketplace."  *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 147 (2d Cir. 2007).

Unfortunately for plaintiffs, the record is equivocal about whether the Purwave mark had been abandoned before its sale.  Abandonment of a mark under 15 U.S.C. § 1127 requires both "non-use of the [mark] by the legal owner" and "no intent by that person or entity to resume use in the reasonably foreseeable future."  *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 169 (2d Cir. 2016).  Sigma Instruments does appear to have stopped using the Purwave mark in the years before the company sold it.  But the record is mixed as to whether Sigma Instruments intended to resume using the mark in the reasonably foreseeable future, during the period before the mark's sale.  Because a reasonable jury could come out either way on that issue, plaintiffs' abandonment theory presents a jury question, and their motion for partial summary judgment is denied.

# FACTUAL BACKGROUND

## I.  The Parties

The parties in this case make handheld massage devices.  Plaintiff Pado, Inc. has sold such devices under the brand "Purewave" since 2015.  Pls. 56.1 ¶ 5.[*]  Pado asserts common law trademark rights in the Purewave mark, *see id.* ¶ 38, but the United States Patent and Trademark Office ("USPTO") has thus far denied requests by Pado and its predecessor-in-interest to federally register the Purewave mark, *see id.* ¶¶ 13-16.  The agency has relied on a "likelihood of confusion with" the similar "Purwave" mark.  *See ibid*.  Co-plaintiff Homelec Korea Co., Ltd. ("Homelec") licenses to Pado a massager-related patent that is used in the Purewave devices.  *Id.* ¶¶ 3-4.

Defendants SG Trademark Holding Co., LLC ("SG") and Wieder and Friedman Enterprises, Inc. ("Wieder") (together, "the Corporate Defendants") sell the competing massager labeled "Mighty Bliss."  *See id.* ¶¶ 8-9, 12.  In December 2019, the Corporate Defendants entered into an agreement to buy the Purwave mark from non-party Sigma Instruments, Inc.  *See id.* ¶ 40; *see* Defs. 56.1 ¶ 7.  The core dispute relevant to the plaintiffs' summary judgment motion is whether the Corporate Defendants purchased a valid mark in that transaction, or whether Sigma Instruments had abandoned the Purwave mark before December 2019 and therefore had no exclusive right to convey.  The question of whether Sigma Instruments had abandoned the Purwave mark depends, in turn, on whether Sigma Instruments had stopped using the mark and whether, if so, the company intended to resume use of the mark in the reasonably

---

[*]  The facts in this section are taken from the parties' exhibits and their statements of fact filed in accordance with Local Rule 56.1.  References to "Pls. 56.1" refer to the final version of the Local Rule 56.1 statement of undisputed facts at Dkt. #79-1.  References to "Defs. 56.1" refer to the final version of the Local Rule 56.1 counterstatement of undisputed facts filed at the end of Dkt. #79-1.  Citations to the parties' statements of fact incorporate the materials cited therein.

foreseeable future.  *See Cross Commerce Media*, 841 F.3d at 169.  Facts relevant to that question are set out below.

## II.  Sigma Instruments and Its Use of the Purwave Mark

Non-party Sigma Instruments primarily sells "chiropractic and orthopedic adjusting instruments."  Decl. of Richard Mandaro ("Mandaro Decl."), Exs. 1-2 at 21:15-16 ("Crunick Tr.") (Dkt. #76-3, #76-4).  According to the company's CEO, John Crunick, Sigma began to explore the creation of a health and beauty division—the Purwave division—around 2013.  *Id.* 21:5-22:6, 37:21-38:10.  To that end, Sigma developed a device to treat "muscle points on the face" through percussive force and to "apply creams to the face."  *Id*. 42:5-44:3; *see* Defs. 56.1 ¶¶ 29-30.  Sigma applied to register the Purwave mark with the USPTO in January 2015, and the registration was issued in March 2016.  Defs. 56.1 ¶¶ 58, 61.  Sigma was listed as the owner of that mark until December 2019.  *See id.* ¶¶ 7-8.

Sigma manufactured and sold about 20 to 40 Purwave devices between late 2014 and 2016.  *See* Defs. 56.1 ¶ 32; Crunick Tr. 327:11-328:20.  There is some conflicting evidence about when Sigma made its last sale.  Plaintiffs allege that Sigma has not sold a Purwave device in the United States since January 2014, *see* Pls. 56.1 ¶ 42, while the Corporate Defendants allege that at least 25 Purwave devices "were manufactured and sold in the U.S. in late 2014 through 2016," Defs. 56.1 ¶ 32.  There appears to be no evidence that Sigma sold any Purwave devices after 2016, although Sigma may not have retained complete records of its Purwave sales. *See* Crunick Tr. 328:19-329:6; *see also id*. 329:7-14.

Sigma engaged or attempted to engage with potential partners in both domestic and international markets through at least 2016, and showed the device at trade shows as late as 2017.  *See* Defs. 56.1 ¶¶ 37-40, 42.  Sigma also provided a Purwave device to a salon in

Pennsylvania for demonstrations between December 2015 and mid-2016, *see id.* ¶ 35, and in September 2016, Sigma unsuccessfully pitched a partnership to the Seattle device division of a major cosmetics company, *see id.* ¶ 49.  Mr. Crunick demonstrated the Purwave device at a trade show in Florida in August 2016 and at several international trade shows in 2016 and 2017. *See id.* ¶¶ 36-37.   In addition, Mr. Crunick testified that, in 2017, Sigma "tried like hell" to develop a relationship with a domestic franchise called "Massage Envy," *id.* ¶ 42, although those efforts did not bear fruit, *see* Crunick Tr. 141:7-143:5.  Mr. Crunick also testified that he gave a Purwave device to a potential distributor in Italy in 2017.  *See id.* 278:10-281:24.

To the extent feasible, Sigma has continued to provide limited support services to customers with in-market Purwave devices, sometimes for a fee.  There is some evidence that Mr. Crunick provided "training and support" to the owner of a Purwave device at a salon in Florida until about mid-2018.  Defs. 56.1 ¶ 44; *see* Crunick. Tr. 213:2-215:11.  Sigma has also provided key codes for the Purwave devices to preexisting customers on several occasions, including as recently as December 2019.  *See* Defs. 56.1 ¶¶ 51-53, 56.  More specifically, emails show that Sigma responded to requests from one customer in the United Kingdom for key codes in October 2016, to another request by the same customer for machine maintenance in May 2018, and to requests from customers in the Netherlands in September 2018 and December 2019. *See ibid.*; *see also* Mandaro Decl., Exs. 38-40 (Dkt. #76-40, #76-41, #76-42) (emails).  Sigma may also have reformatted "serial tags" on a Purwave product for a customer in Italy in March 2017, although the record only reflects that such tags were requested, and Mr. Crunick testified that he could not recall whether the tags were sent.  *See* Defs. 56.1 ¶ 40; Crunick Tr. 282:9-283:8.  In April 2018, Mr. Crunick sent Purwave device training videos to a foreign distributor. *See* Defs. 56.1 ¶ 43.   And Mr. Crunick testified that sometime around May 2020, he

communicated on Facebook with a customer in Amsterdam who was having problems with her Purwave device.  He testified that he intended to have the customer ship the device to Sigma to see if there was anything Sigma could do to repair it.  *See* Crunick Tr. 71:13-73:15.

Sigma maintained a website devoted to the Purwave product for a period of time.  There is no evidence that the website included a mechanism for directly purchasing Purwave devices, but archived Internet pages of www.purwave.com as of August 2018 show that the website included a "Contact" section directing any inquiries for "information and requests about Purwave" to Mr. Crunick and providing his cell phone number, email address, and physical address.  *See* Defs. 56.1 ¶¶ 45-46 (citing Mandaro Decl., Ex. 21 (Dkt. #76-32) (archived Internet pages)); *see also id.* at SG1191 (archived page including contact information); Crunick Tr. 351:21-352:15.  The parties present conflicting evidence as to whether and when the website was taken down.  Sigma paid for the website through at least January 2019, *see* Defs. 56.1 ¶¶ 45, 55, and Mr. Crunick testified that he automatically renewed the website registration as recently as February 2020—after selling the trademark, *see* Crunick Tr. 416:8-15.  Plaintiffs put forward some evidence that Sigma "took down" the website sometime "[i]n the last year," causing that page to redirect to a website irrelevant to Sigma's products or marks.  *See* Pls. 56.1 ¶ 44 (citing Decl. of Steven Lee, Ex. 22 ¶ 58 (Dkt. #65-22)), while the Corporate Defendants deny that Sigma ever "affirmatively" took down the website, *see ibid*.

Around November 2018, Sigma filed a patent application that appears to discuss both facial and spinal treatments.  *See generally* Mandaro Decl., Ex. 43 (Dkt. #76-45).  The patent application repeatedly discusses a "facial stimulator" and treatment of the "facial muscles."  *E.g.*, *id.* at SG1752, SG1762-64, SG1771, SG1774.  Mr. Crunick testified that the patent application was intended to cover the Purwave device, *see* Crunick Tr. 124:16-125:11, but later gave

6

conflicting testimony as to the possible scope of the patent and admitted that he may have been confused about it during his deposition, *id.* 492:12-17.

Mr. Crunick has given somewhat inconsistent accounts of Sigma's activities and intentions regarding the Purwave device.   In a declaration that plaintiffs submitted with their summary judgment filing, Mr. Crunick states that Sigma's last sale of a Purwave device took place in January 2014, that Sigma "never formed any business plans or other intention to begin re-using" the Purwave mark after January 2014, and that Sigma "decided to discontinue" the Purwave product in or around January 2018.   Crunick Decl. ¶¶ 6-7, 9 (Dkt. #64-2).   But when Mr. Crunick was later deposed, he testified that he had "no idea what [the declaration] was all about," Crunick Tr. 392:5, had not closely reviewed the declaration before signing it, and that some of the information in the declaration was inaccurate, including some key dates, *see* Defs. 56.1 ¶ 24; Crunick Tr. 391:17-392:14, 388:12-22.   In fact, he stated, it was in January 2018 when Sigma ceased forming "any business plans or other intention to begin reusing the Purwave trademark or any product or services."   Crunick Tr. 480:24-481:5.   Mr. Crunick also testified that, at the time he filed the patent application in 2018, he was planning on continuing to sell the Purwave device and considering creating a Purwave "home retail product."   *Id.* 125:21-126:13, 400:10-18.

### III. SG's Purchase and Use of the Purwave Mark

In December 2019—about three weeks after Pado filed this lawsuit claiming trademark, patent, and copyright infringement—a principal of SG emailed Mr. Crunick asking if Sigma would be willing to sell its Purwave trademark to SG.   *See* Pls. 56.1 ¶ 40; Mandaro Decl., Ex. 16 (Dkt. #76-18) (email); Crunick Decl. ¶ 10.   Mr. Crunick wrote back that he had discussed the offer with his partners and agreed to the sale.   *See* Mandaro Decl., Ex. 16.   In a deposition in this

7

case, Mr. Crunick explained that he agreed to sell the mark because Sigma was not using it: "We're not using it right now, so we'll just take the money for it.  And so, you know, I agreed to that."  Crunick Tr. 459:10-22.  Later that month, Sigma and SG executed a trademark purchase agreement.  Defs. 56.1 ¶ 7.  That agreement states that Sigma transferred "all right, title, and interest in and to the PURWAVE mark, together with the goodwill of the business symbolized thereby" and "all past, present, and future causes of action and claims for damages derived by reason of infringement thereof."  Decl. of Moshe Friedman, Ex. A (Dkt. #76-51) (trademark purchase agreement); *see* Defs. 56.1 ¶¶ 9, 11.  Sigma also executed a trademark assignment to be recorded with the USPTO.  *See id.* ¶ 8.

SG and Wieder represent that, upon obtaining rights to the Purwave mark, they "immediately began to work to develop and launch" their own Purwave massager "for cosmetic treatment of the face."  *Id.* ¶ 12.  In February 2020, they identified a "hot and cold beauty massager" and "decided to move forward" with that product under the Purwave mark.  *Id.* ¶¶ 15-16.  They further assert that Wieder began selling the Purwave massager on the Mighty Bliss website by the end of March 2020.  *Id.* ¶ 23.

## PROCEDURAL HISTORY

This lawsuit began in November 2019, when Pado and Homelec filed suit against the Corporate Defendants, as well as related entities and individuals.  *See* Second Am. Compl. ("SAC") (Dkt. #32).  Plaintiffs alleged that defendants' Mighty Bliss massager infringes on plaintiffs' patent rights in their Purewave massager.  *See id.* ¶¶ 39-51.  They also alleged that defendants' Mighty Bliss user manual infringes on plaintiffs' copyright to the Purewave massager user manual.  *See id.* ¶¶ 67-76.  Finally, plaintiffs alleged that defendants violated

plaintiffs' common law rights to the Purewave mark by using the term "Pure Wave" in a product description on defendants' website and in advertisements. *See id.* ¶¶ 77-78, 81-83.

After defendant SG purchased the registered trademark "Purwave" in December 2019—and used that mark to persuade Amazon to remove Pado's Purewave device from the Amazon marketplace, *see* Pls. 56.1 ¶¶ 49, 50-52, 54—Pado and Homelec filed a second amended complaint that added new claims.  Plaintiffs sought cancellation of the Purwave trademark registration under 15 U.S.C. § 1064.  *See* SAC ¶¶ 190-199.  They also requested a declaratory judgment under 28 U.S.C. § 2201 that Pado and Homelec did not engage in trademark infringement, false designation of origin, or unfair competition in connection with SG's asserted Purwave trademark.  *See id.* ¶¶ 233-240.

The Corporate Defendants filed counterclaims against plaintiffs.  They alleged trademark infringement under 15 U.S.C. § 1114, false designation of origin and unfair competition under 15 U.S.C. § 1125, and unfair competition under New York common law.  *See* Am. Countercl. ¶¶ 238-283 (Dkt. #54).  The false designation of origin and unfair competition claims rest, at least in part, on the Corporate Defendants' argument that they hold rights to the Purwave mark with which plaintiffs have interfered.  In its answer to the amended counterclaims, Pado argues that SG's registration of the Purwave trademark should be cancelled, because Sigma abandoned the mark before selling it to SG and because the trademark assignment to SG was an invalid assignment in gross.  *See* Pado Answer to Am. Countercl. at 43-44 (Dkt. #60); Homelec Answer to Am. Countercl. at 43 (Dkt. #66).

Shortly after the Corporate Defendants filed their amended counterclaims, Pado moved for a preliminary injunction on its abandonment and assignment-in-gross defenses.  *See* Mot. for Prelim. Inj. (Dkt. #59).  Pado and Homelec then filed the instant motion seeking partial summary

judgment.  Specifically, plaintiffs seek summary judgment on their cancellation claim; their claim for a declaratory judgment that plaintiffs did not engage in trademark infringement, false designation of origin, or unfair competition in connection with SG's asserted Purwave trademark; and their related defenses of abandonment and assignment in gross.  *See* Pls.' Br. at 2; *see also* SAC ¶¶ 190-199, 233-240; Pado Answer at 43-44; Homelec Answer at 43-44.  The parties engaged in several months of expedited discovery after those motions were filed.  *See* Order (Mar. 25, 2020).  I held oral argument on both motions.  *See* Minute Entry and Order (Sept. 1, 2020).  On December 22, 2020, I denied Pado's motion for preliminary injunction because I concluded that Pado had failed to demonstrate that it would suffer irreparable harm in the absence of a preliminary injunction.  *See generally* Memorandum and Order (Dec. 22, 2020) (Dkt. #95).

## DISCUSSION

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A genuine issue of fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a factual dispute is material if it "might affect the outcome of the suit under the governing law."  *Frost v. New York City Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020).  In determining whether there is a genuine issue of material fact, a court evaluates the whole record, resolving all ambiguities and drawing all permissible factual inferences in favor of the non-movant.  *See ibid.*  Here, the parties agree, plaintiffs' claims for summary judgment all flow from plaintiffs' argument that Sigma abandoned the Purwave mark before its sale.  *See* Oral Arg. Tr. at 34:2-35:4 (counsel for plaintiffs); 104:19-105:14 (counsel for defendants).  As

explained below, however, a genuine issue of material fact exists concerning whether Sigma did so.  I therefore deny plaintiffs' motion for summary judgment on all four counts.

## I.     Abandonment

"The abandonment doctrine derives from the well-established principle that trademark rights are acquired and maintained through use of a particular mark." *ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 146 (2d Cir. 2007) (citing *Pirone v. MacMillan, Inc.*, 894 F. 2d 579, 581 (2d Cir. 1990)).  Under the Lanham Act, the owner of a trademark abandons its rights in the mark when its use of the mark "has been discontinued with intent not to resume such use" or when its conduct causes the mark to become "generic."  15 U.S.C. § 1127.  "Once abandoned," a trademark "returns to the public domain" and may be used by persons other than the owner. *ITC Ltd.*, 482 F.3d at 147.

Abandonment is an affirmative defense to a claim of trademark infringement. *See id.* at 146; *see also Defiance Button Mach. Co. v. C & C Metal Prod. Corp.*, 759 F.2d 1053, 1059 (2d Cir. 1985).  To establish abandonment under 15 U.S.C. § 1127, an alleged infringer must establish both (i) "non-use of the [mark] by the legal owner," and (ii) "no intent by that person or entity to resume use in the reasonably foreseeable future." *Cross Commerce Media, Inc. v. Collective, Inc.*, 841 F.3d 155, 169 (2d Cir. 2016); *see ITC Ltd.*, 482 F.3d at 147.  The party asserting an abandonment defense "bears the burden of persuasion" with respect to both elements. *ITC Ltd.*, 482 F.3d at 147.  Courts in this circuit have required abandonment of a mark to be "proven by clear and convincing evidence." *Emmpresa Cubana Del Tabaco v. Culbro Corp.*, 213 F. Supp. 2d 247, 268 (S.D.N.Y. 2002) (citing *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980)); *see Dual Groupe, LLC v. Gans-Mex LLC*, 932 F. Supp. 2d 569, 574 (S.D.N.Y. 2013); *see also* J. Thomas McCarthy, 3 *McCarthy on Trademarks and*

*Unfair Competition* § 17:12 (5th ed. 2021) (stating that "[t]he majority of courts" require that "evidence of the elements of abandonment must be clear and convincing").

The Lanham Act provides that non-use of a mark for three consecutive years constitutes "*prima facie* evidence of abandonment." 15 U.S.C. § 1127. Where a party moves for summary judgment that a mark has been abandoned, and establishes such a *prima facie* case of abandonment, the nonmovant is required "to come forward only with such contrary evidence as, when viewed in the light most favorable to [the nonmovant], would permit a reasonable jury to infer that it had not abandoned the mark." *ITC Ltd.*, 482 F.3d at 149. Specifically, the trademark owner must "adduce sufficient evidence to permit a reasonable jury to conclude that, in the three-year period of non-use," it "nevertheless maintained an intent to resume use of its registered mark in the reasonably foreseeable future." *Ibid.* "The ultimate burden of persuasion on the issue of abandonment," therefore, "remains at all times with the alleged infringer." *Id.* at 148.

A.   **Nonuse**

There is no genuine dispute of material fact as to whether the Purwave mark was used in the three years between late 2016 and late 2019, when Sigma sold the mark to SG. "Use" of a trademark means application of the mark "sufficient to maintain 'the public's identification of the mark with the proprietor.'" *Stetson v. Howard D. Wolf & Assocs.*, 955 F.2d 847, 851 (2d Cir. 1992) (quoting *Silverman v. CBS*, 870 F.2d 40, 48 (2d Cir. 1989)). "Use" requires "bona fide use" of a mark "made in the ordinary course of trade, and not made merely to reserve a right in the mark." 15 U.S.C. § 1127; *see Silverman*, 870 F.2d at 48 (noting that "use" means "commercial use"); *United We Stand Am., Inc. v. United We Stand, Am. New York, Inc.*, 128 F.3d 86, 92 (2d Cir. 1997). What constitutes use of a mark depends on the nature of a mark holder's "occupation or business," but "[m]inor activities" cannot shield a mark holder from a finding of

12

abandonment.  *Stetson*, 955 F.2d at 851; *see La Societe Anonyme des Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1271-72 (2d Cir. 1974) (defining "bona fide usage" as "deliberate and continuous" use, rather than "sporadic, casual or transitory" use); *Sadhu Singh Hamdard Tr. v. Ajit Newspaper Advert., Mktg. & Commc'ns, Inc.*, 394 Fed. App'x 735, 736 (2d Cir. 2010) (noting the same).

Applying those principles, there is no genuine dispute of material fact that Sigma did not use the Purwave mark in commerce in the three years before the mark's sale.  Defendants have not claimed any sale or manufacture of Purwave devices after early to mid-2016.  Defs. 56.1 ¶ 32; *see* Crunick Tr. 329:7-14 (deposition testimony by Mr. Crunick that "there were not machines made after" January 2016); *cf.* Pls. 56.1 ¶ 42 (asserting that no sale of Purwave products occurred after January 2014).  Sigma's failure to manufacture or sell Purwave devices is strong evidence that Sigma ceased use of the Purwave mark for purposes of the Lanham Act by late 2016.  *See Phillips-Van Heusen Corp. v. Calvin Clothing Co.*, 444 F. Supp. 2d 250, 255 (S.D.N.Y. 2006) (finding nonuse based on testimony that trademark owner "did not make any sales of men's clothing" under the trademark for a 10-year period); *Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286, 310 (S.D.N.Y. 2000) (holding that "sporadic uses" of a mark for equipment over a three-year period, including "two or three" sales and the distribution of a brochure advertising the equipment, did not defeat a finding of nonuse); *cf. Specht v. Google Inc.*, 747 F.3d 929, 934 (7th Cir. 2014) (describing as "conclusive" the evidence that owner ceased use of a mark because sales ceased in 2002, even though in the following five years, owner maintained a website bearing the mark, attempted to sell the business assets, and used the mark in two sales pitches).

The Corporate Defendants question whether plaintiffs have put forward competent evidence that Sigma failed to manufacture or sell Purwave devices after 2016—though the Corporate Defendants themselves have not put forward evidence of later manufacturing or selling. The Corporate Defendants argue that the Crunick Declaration that plaintiffs invoke should be disregarded because Mr. Crunick testified in his deposition that he did not review the declaration closely before signing it and stated that several statements in the declaration were inaccurate. *See* Defs.' Mem. of L. in Opp'n to Partial Summ. J. at 8-9, 12-16 ("Defs.' Opp'n Br.") (Dkt. #78); *see also* Crunick Tr. 392:1-400:18. But while Mr. Crunick in his deposition denied the accuracy of the portions of the Crunick Declaration stating that Sigma had not sold or manufactured a Purwave product since January 2014, *see* Crunick Tr. 396:9-15, 398:6-13, Mr. Crunick also acknowledged in his deposition that he did not believe any Purwave devices were manufactured after January 2016, *see id.* 329:7-14, and Sigma's invoices do not show any sales beyond that date, *see* Mandaro Decl., Exs. 22-28.

The Corporate Defendants suggest that even if Sigma did not manufacture or sell Purwave devices after late 2016, Sigma still engaged in use of the Purwave mark by keeping up the Purwave website, maintaining devices, and engaging in certain promotional efforts. As to the website, in particular, the Corporate Defendants point to evidence that Sigma maintained and paid for www.purwave.com through at least January 2019. *See* Defs.' Opp'n Br. at 17-20; *see also* Defs. 56.1 ¶¶ 45-46, 55, 57. But maintenance of the Purwave website is insufficient by itself to establish use in commerce. The Second Circuit has explained that "the mere advertising or promotion of a mark in the United States is insufficient to constitute 'use' of the mark 'in commerce' within the meaning of the Lanham Act." *Buti v. Perosa, S.R.L.*, 139 F.3d 98, 105 (2d Cir. 1998) (quoting 15 U.S.C. § 1127); *see Vantone Grp. Ltd. Liab. Co. v. Yangpu NGT*

14

*Indus. Co.*, No. 13-CV-7639, 2016 WL 4098564, at *8 (S.D.N.Y. July 28, 2016).  In deciding whether the display of a mark constitutes more than "mere advertising," "[a] crucial factor in the analysis is if the use of an alleged mark is at a point of sale location."  *Hypnotic Hats, Ltd. v. Wintermantel Enters., LLC*, 335 F. Supp. 3d 566, 593 (S.D.N.Y. 2018).  Mere advertising does not constitute "use" of a mark within the Lanham Act, but "point of sale" displays may constitute such "use."  *See Menashe v. V Secret Catalogue, Inc.*, 409 F. Supp. 2d 412, 424 (S.D.N.Y. 2006).  This principle extends to marks displayed on a website.  *Ibid.*  Accordingly, a mark holder's maintenance of a website displaying the mark, standing alone, does not establish use of the mark in commerce.  *Ibid.*

That conclusion is consistent with guidance from the Trademark Trial and Appeal Board ("TTAB").  The TTAB has stated that a company's maintaining a website that bears a trademark does not constitute commercial use of that mark if the website does not provide a means for ordering the relevant product.  *See In re Genitope Corp.*, 78 U.S.P.Q.2d 1819, at *2-*3 (T.T.A.B. 2006); *see also* J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 16:32.70 (5th ed. 2021) ("A web site that only indicates how the shopper can obtain more information about the product or service [is] not acceptable as a use at the point of sale because it is regarded as only advertising and promotional material, which is not acceptable as a specimen.").  While the www.purwave.com website contained contact information for Mr. Crunick, such contact information, standing alone, has not been treated as supplying a means for ordering a product.  *See In re Genitope Corp.*, 78 U.S.P.Q.2d 1819, at *2 (explaining that even though a website bearing the trademark listed the company name, address, and phone number, the site did not establish commercial use of the mark because the information constituted "only location information about [the] applicant," not "a means to order goods"); *JFY Props. II LLC v.*

*Gunther Land, LLC*, No. 17-CV-1653, 2019 WL 4750340, at *27 (D. Md. Sept. 30, 2019) (finding no commercial use where a website displayed a trademark and offered the company's name, address, and phone number, but no way to purchase a product or service associated with the mark).

The Corporate Defendants also argue that Sigma did not discontinue use of the Purwave mark before the mark's sale because Sigma provided occasional assistance to users with in-market Purwave devices as recently as December 2019.  *See* Defs. 56.1 ¶¶ 52-53, 56.  But providing key codes and occasional repair service for products that were previously sold is not the type of use contemplated in the Lanham Act.  While repairs (or similar assistance) may constitute use where a third party "so alter[s]" the "original manufacturer's" product "as to be a different product," a "mere repair of a trademarked good, followed by a return of the good to the same owner who requested the repair or rebuild," is unlikely to constitute actual use.  *Karl Storz Endoscopy Am., Inc. v. Surgical Techs., Inc.*, 285 F.3d 848, 855-56 (9th Cir. 2002); *see Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 535 (4th Cir. 2000) (stating that "incidental use in . . . repair is not the 'use' required to preserve trademark rights under the Lanham Act"); *see also Stetson*, 955 F.2d at 851.

The Corporate Defendants next point to evidence that Mr. Crunick provided a Purwave device to a Florida salon and stayed in contact with that salon into 2018.  But the Corporate Defendants' own evidence suggests that the device had been distributed to the salon by 2014.  *See* Defs. 56.1 ¶ 44 (citing a Purwave-related Facebook post by that salon in 2014).  While Mr. Crunick may have stayed in touch with the salon after that, the Corporate Defendants have not provided evidence that Mr. Crunick had sufficient ongoing involvement with the Purwave device

at that salon for Mr. Crunick's activities involving that salon's device to qualify as use of the Purwave mark for purposes of the Lanham Act.

Finally, the Corporate Defendants rely on evidence of international activities.  They point to evidence that "[a]fter 2016," Sigma promoted the Purwave device at international trade shows "including in Mexico, the Netherlands, Russia, and India," *see* Defs. 56.1 ¶ 37, and evidence that Sigma may have provided a Purwave device to a distributor in Italy in 2017, *see id.* ¶ 40; Crunick Tr. 277:9-278:4, 280:6-24 (testimony that Mr. Crunick took a Purwave device to the distributor and gave an "overview of the Purwave" to "about 10, 15 doctors").  But that limited promotional conduct does not constitute "use in commerce."  *See La Societe Anonyme des Parfums le Galion*, 495 F.2d at 1272; *Stetson*, 955 F.2d at 851; *see also Gameologist Grp., LLC v. Sci. Games Int'l, Inc.*, 508 Fed App'x 31, 33 (2d Cir. 2013) (finding the use in commerce requirement for registering a mark in the lottery ticket industry not satisfied by "other uses of the mark," including "promotional efforts" and the "sale of approximately 250 board games over several years"); *Pilates, Inc.*, 120 F. Supp. 2d at 309-10 (finding, after a bench trial, that two or three sales and distribution of a "single brochure," coupled with a lack of evidence that the mark was used on goods or their packaging, did not demonstrate use).  That is especially true here, given that any trade shows Sigma attended after 2016 took place abroad and therefore did little to maintain "the public's identification of the mark with the proprietor."  *Stetson*, 955 F.2d at 851; *cf. ITC Ltd.*, 482 F.3d at 155 ("The territoriality principle requires the use to be in the United States for the owner to assert priority rights to the mark under the Lanham Act."); *Haggar Int'l Corp. v. United Co. for Food Indus. Corp.*, 906 F. Supp. 2d 96, 109 (E.D.N.Y. 2012) ("Commercial use of a mark overseas cannot form the basis for a holding of priority trademark use in the United States." (quotations omitted)).

17

### B.      Intent Not to Resume Use

Although there is no genuine issue of material fact that the Purwave mark was not used in the three years before Sigma sold the mark to SG, plaintiffs are not entitled to summary judgment on abandonment because a triable issue of fact exists with respect to Sigma's intent to resume use of the Purwave trademark.  At the summary judgment stage, when there is no genuine factual dispute regarding nonuse of the mark, a mark owner can avoid summary judgment if they "adduce sufficient evidence to permit a reasonable jury to conclude that, in the three-year period of non-use," the relevant mark owner "nevertheless maintained an intent to resume use of its registered mark in the reasonably foreseeable future."  *ITC Ltd.*, 482 F.3d at 149.   Whether a trademark owner intended to resume use is "rarely amenable to summary judgment," *id.* at 150, so long as the owner presents evidence other than "simply asserting a vague, subjective intent to resume use of a mark at some unspecified future date," *Emergency One, Inc.*, 228 F.3d at 537; *see ITC Ltd.*, 482 F.3d at 150 (noting that "courts have generally held that a trademark owner cannot rebut a presumption of abandonment merely by asserting a subjective intent to resume use of the mark at some later date").

Here, the Corporate Defendants have introduced evidence that Sigma intended to resume use of the Purwave mark, including evidence of "outside events . . . from which an intent to resume use during the nonuse period may reasonably be inferred."  *ITC Ltd.*, 482 F.3d at 150. The evidence includes Mr. Crunick's deposition testimony that as late as November 2018, he planned to continue selling the Purwave device and to develop and sell a home retail product under the Purwave mark, *see* Crunick Tr. 126:3-13, 400:10-18, his testimony that he "tried like hell" to establish a relationship with a domestic massage franchise in 2017, *id.* 141:13-143:22, his testimony that he continued promoting the Purwave device abroad and was in contact with a

salon that was demonstrating the Purwave massager as recently as 2018, *see id.* 105:24-111:5, 214:15-215:11, and Sigma's continued maintenance of the Purwave website, s*ee* Mandaro Decl., Ex. 21; Crunick Tr. 397:18-21.  While those efforts do not constitute commercial use of the mark (as explained above), a reasonable factfinder could infer from those efforts that Sigma still intended to use the Purwave brand and to sell Purwave devices—even in the years after sales had tapered off.

That inference finds further support in Sigma's patent application of November 2018. *See* Mandaro Decl., Ex. 43 at SG1752, SG1762-64.  A reasonable factfinder could infer that the patent application was intended to cover the Purwave device because it repeatedly mentions facial stimulation through massage.  And a reasonable factfinder could credit Mr. Crunick's argument that the patent application was evidence that Sigma intended to continue to sell the Purwave device, because the company "wouldn't spend the money on [the patent application] if [the company wasn't] going to try to do something with it."  Crunick Tr. 124:16-126:13.  *See Faram 1957 S.p.A. v. Faram Holding & Furniture, Inc.*, No. 16-CV-2430, 2018 WL 1394178, at *15 (S.D.N.Y. Mar. 19, 2018) (relying on patent holder's declaration that he intended to file for trademark protection before the USPTO in denying summary judgment on abandonment).

Plaintiffs primarily argue that summary judgment is appropriate because the Crunick Declaration "conclusively establishes" that Sigma abandoned the Purwave mark "years before it assigned" that mark to SG.  Pls.' Br. at 12.  Mr. Crunick stated in that declaration that, after January 2014, Sigma did not sell or manufacture any Purwave devices and "never formed any business plans or other intention to begin reusing" the Purwave trademark.  Crunick Decl. ¶¶ 7-11.  But a reasonable factfinder could decline to credit those statements because Mr. Crunick disavowed them in his deposition.  *See* Crunick Tr. 392:2-14, 396:6-400:18.  When a party's

deposition testimony contradicts that party's affidavit or declaration, courts in this circuit have concluded that the deposition testimony has an "increased level of reliability" over the affidavit or similar filing.  *AB ex rel. EF v. Rhinebeck Cent. Sch. Dist.*, 361 F. Supp. 2d 312, 316 (S.D.N.Y. 2005) ("Faced with deposition testimony that contradicts an affidavit and a complaint, this court must accept [the witness's] sworn testimony."); *see U.S. Underwriters Ins. Co. v. 14-33/35 Astoria Blvd.*, No. 10-CV-1595, 2014 WL 1653199, at *6 (E.D.N.Y. Apr. 23, 2014) (collecting cases and applying this rule where the party's affidavit was filed before the deposition was taken); *cf. Santos v. Murdock*, 243 F.3d 681, 684 (2d Cir. 2001) (where a plaintiff's only evidence in opposing summary judgment was a witness's affidavit, and the witness contradicted that affidavit in a subsequent deposition, summary judgment was appropriate because "an implicit or explicit showing that the affiant is prepared to testify in a manner consistent with an affidavit is required to oppose summary judgment").  At minimum, viewing the record in the light most favorable to the Corporate Defendants, a reasonable factfinder could credit Mr. Crunick's deposition testimony over his declaration.  Viewing the evidence as a whole and in the light most favorable to the Corporate Defendants, a genuine issue of material fact exists regarding Sigma's intent to resume use of the Purwave mark in the period preceding its sale.

## II.    Assignment-in-Gross Defense and Cancellation and Declaratory Judgment Claims

For related reasons, plaintiffs are not entitled to summary judgment on their assignment-in-gross defense or on their cancellation and declaratory judgment claims.

Plaintiffs are not entitled to summary judgment on their assignment-in-gross defense because that defense depends on plaintiffs' abandonment arguments.  The assignment-in-gross defense reflects the principle that "a trademark cannot be sold or assigned apart from [the] goodwill it symbolizes" or accompanying business assets.  *Marshak v. Green*, 746 F.2d 927, 929

20

(2d Cir. 1984).  Here, plaintiffs argue that Sigma's assignment of the Purwave mark to SG was an assignment-in-gross because Sigma had "no business assets" and "no goodwill" to transfer "at the time of the sale" due to the mark's abandonment.  Pls.' Br. at 13 & n.3; *see ibid.* ("[T]here was no goodwill to be transferred due to the [Purwave] mark's abandonment."); Pls.' Reply Br. at 9 (Dkt. #79) ("Because Sigma had already abandoned the [Purwave] mark, there was no goodwill to transfer."); *see also* Pls. 56.1 ¶¶ 45-47.  As a result, plaintiffs have acknowledged that their assignment-in-gross theory depends on plaintiffs' establishing abandonment.  *See* Oral Arg. Tr. 34:2-35:4 (plaintiffs' counsel stating that "essentially the assignment in gross and the abandonment issues do collapse for this inquiry because the transfer was of an abandoned mark").  Accordingly, because there is a genuine dispute of material fact about abandonment, summary judgment is denied on plaintiffs' assignment-in-gross defense.

The cancellation and declaratory-judgment claims in plaintiffs' motion for summary judgment also fail.  Plaintiffs' arguments for summary judgment on those claims again rest on the premise that Sigma abandoned the Purwave mark before selling it.  *See* Pls.' Br. at 8 ("Plaintiffs should be granted summary judgment on their claim that the PURWAVE mark was abandoned at the time that SG acquired the PURWAVE Registration, and therefore should likewise be granted summary judgment on their cancellation and declaratory judgment of noninfringement claims."); *see also* Oral Arg. Tr. 34:2-35:4.  Because there is a genuine issue of material fact as to Sigma's abandonment of the Purwave mark, summary judgment on plaintiffs' cancellation and declaratory judgment claims is denied.

**CONCLUSION**

Plaintiffs' motion for partial summary judgment is denied.

SO ORDERED.


*/s/ Rachel Kovner*
RACHEL P. KOVNER
United States District Judge

Dated: March 22, 2021
        Brooklyn, New York

22